923 So.2d 1060 (2005)
AMSOUTH BANK
v.
Henry TICE and Henry Tice d/b/a Import Specialists.
1031391.
Supreme Court of Alabama.
July 1, 2005.
Rehearing Denied September 23, 2005.
*1061 Edward A. Dean and Mary Carol Ladd of Armbrecht Jackson, LLP, Mobile, for appellant.
L. Daniel Mims and Theresa N. Williamson of L. Daniel Mims, PC, Mobile, for appellees.
STUART, Justice.
AmSouth Bank appeals from a judgment entered on a jury verdict awarding Henry Tice, individually, and Henry Tice d/b/a Import Specialists $52,206.75 in out-of-pocket expenses and $290,000 in damages for mental anguish. We reverse the judgment and remand the cause for a new trial.

Facts
Henry Tice is a wholesaler of used automobiles. Tice conducts this business through Import Specialists, a sole proprietorship. Tice resides in Alabama, but he maintained a business checking account for Import Specialists with a branch office of AmSouth located in Florida.
In August 1999, Tice gave numerous checks written on his AmSouth account totaling $174,000 to Dan Jaquish, whom Tice described as his "best friend" and a frequent business associate. Jaquish is also a wholesaler (and a retailer) of used automobiles; he does business under the name "Auto Outlet." The checks were drawn on Tice's business account at AmSouth and were made payable to "Auto Outlet." According to Tice, these checks were security for a loan Jaquish had made to Tice and Jaquish was to hold the checks and cash them later. Tice claimed that he and Jaquish then made other payment arrangements for the alleged loan, and, he said, both he and Jaquish agreed that Tice would stop payment on the checks he had issued as security for the loan.
A day or two after he had given the checks to Jaquish, Tice went to an AmSouth branch and placed written stop-payment orders on the checks he had given Jaquish. Pursuant to the "Customer Account Agreement" governing Tice's checking account at AmSouth, oral stop-payment orders are effective for 14 days; written stop-payment orders are effective for 6 months.[1] After either 14 days or 6 months, depending on whether it was oral or written, a stop-payment order expires.
Nearly two years after Jaquish received the checks from Tice, Jaquish, or someone acting on his behalf, presented those checks for payment at three different AmSouth branches. The checks were all presented on the same day  May 18, 2001. The checks were over six months old and were thus, in bank terminology, considered "stale-dated" checks. At the first AmSouth branch, the teller, who was also a manager, refused to cash the checks presented because, she said, she felt "uncomfortable" with the circumstances surrounding *1062 the attempted negotiation of the checks and because of the age of the checks. She returned the stale-dated checks to the unidentified man who had presented them for payment; however, the teller/manager made no notations on the checks and took no further actions regarding those checks.
At the other two AmSouth branches, however, the tellers who were presented with the stale-dated checks written on Tice's account and made payable to "Auto Outlet" exchanged the checks for AmSouth "official checks"[2] and placed a hold against Tice's account in the amount of the checks. However, no one at any of the three AmSouth branches attempted to contact Tice regarding the stale-dated checks to determine if he wanted AmSouth to pay the checks. No one at any of the three AmSouth branches attempted to alert Tice to the fact that someone was attempting to negotiate the almost two-year-old checks. Under the guidelines for AmSouth tellers, which are contained in a manual given to all tellers, a teller presented with a stale-dated check is to contact the customer on whose account the check is written before the bank pays the stale-dated check. Additionally, under the guidelines, stale-dated checks that were presented and refused for payment were to be clearly marked on the face of the check with the words "Do Not Pay. Stale-Dated."
Tice's account was debited for the amount of the checks. After AmSouth deducted the amount of the stale-dated checks from Tice's checking account, that account had insufficient funds with which to pay other checks that had been presented for payment. On Monday, May 21, 2001 (the next banking day after AmSouth paid the stale-dated checks made out to Auto Outlet), AmSouth returned as "unpaid" six checks drawn on Tice's account and payable to "Manheim's,"[3] an automobile auction company with which Tice did business. AmSouth returned as unpaid Tice's checks to Manheim's totaling over $95,000. As a result of the returned checks, Manheim's listed Tice and his business in a "KO" book used by automobile-auction companies. According to Tice, this listing prevented Tice from participating at many of the automobile auctions where he had previously conducted business.[4]
On December 17, 2001, Manheim's sued Tice in the Baldwin Circuit Court. On August 23, 2002, Manheim's obtained a partial summary judgment in its favor in the amount of $148,957.75 on its claims against Tice alleging breach of contract and seeking relief under § 6-5-285, Ala. Code 1975. This judgment represented $96,750 Tice owed for automobiles he had acquired at the auction held by Manheim's as to which AmSouth had returned his checks as unpaid, $14,996.25 in interest, and $37,211.50 for attorney fees and costs. All other claims Manheim's asserted against Tice were dismissed.
Before the summary judgment in favor of Manheim's was made final, Tice filed a third-party complaint against AmSouth, alleging, *1063 among other things, negligence and wantonness under Alabama common law and violations of Florida's version of the Uniform Commercial Code ("the UCC") for wrongful dishonor of checks, Fla. Stat. Ann. § 674.402 (West 1993), and for wrongful payment of stale-dated checks, Fla. Stat. Ann. § 674.404 (West 1993).[5] Tice claimed damages based on severe emotional distress and also sought to be reimbursed for his out-of-pocket expenses. Tice's negligence, wantonness, and UCC-violation claims against AmSouth went to trial.
At the conclusion of Tice's case-in-chief and again at the close of all the evidence, AmSouth moved for a judgment as a matter of law ("JML"). In addition to arguing that Tice was not entitled to recover damages for mental anguish in the context of this case and other things, AmSouth asserted that Tice's claims under the UCC displaced his common-law negligence and wantonness claims. The trial court specifically noted that although the UCC claims displaced certain of Tice's common-law claims it did not displace his negligence and wantonness claims. Additionally, the trial court overruled AmSouth's motion for a JML to the extent it sought to exclude Tice's request for mental-anguish damages. The case went to the jury on Tice's claims of negligence, wantonness, and violations of the UCC.
After the jury trial, the jury returned a general verdict in favor of Tice. The jury awarded Tice $52,206.75 for his out-of-pocket expenses[6] and $290,000 in damages for mental anguish. AmSouth renewed its motion for a JML and filed a motion for a new trial and/or for a remittitur. The trial court denied those motions. AmSouth appeals, making the following arguments:
"I. Mental anguish damages are not recoverable on any of Tice's claims.
"II. Tice's common-law negligence and wantonness claims are displaced by the [UCC].
"III. There was insufficient evidence to support Tice's wantonness claim.
"IV. The trial court erred in permitting testimony that was barred by the parol evidence rule, the statute of frauds, and the hearsay rule.
"V. The damages award for mental anguish is excessive.
"VI. The trial court erred in permitting Tice to seek damages for interest on Manheim's judgment."
Our resolution of argument II pretermits any discussion of the other arguments.

Standard of Review
In Waddell & Reed, Inc. v. United Investors Life Insurance Co., 875 So.2d 1143 (Ala.2003), this Court stated the standard of review applicable to a trial court's ruling on a motion for a JML:
"When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. The nonmovant must have presented substantial evidence in order to withstand *1064 a motion for a JML. A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling."
875 So.2d at 1152 (citations omitted).

Analysis
We begin by reviewing AmSouth's argument that Tice's common-law claims are displaced by his UCC claims. AmSouth argues that the trial court erred in not granting its motion for a JML on Tice's common-law claims of negligence and wantonness. AmSouth argued in that motion that Tice's common-law claims were displaced by the provisions of Florida's version of the UCC at issue in this case. However, the trial court rejected that argument and submitted the negligence and wantonness claims to the jury along with the UCC claims.
Because the transactions underlying Tice's UCC claims are governed by Florida's version of the UCC, we must apply Florida law in this case. However, we find no Florida authority on the precise issue presented here  i.e., whether Tice's common-law negligence and wantonness claims are displaced by § 674.402 and § 674.404 of Florida's version of the UCC.[7]
We look to § 671.103, Fla. Stat. Ann. (West 2004), for guidance on the relationship between the UCC and the common law. That section provides:
"Unless displaced by the particular provisions of this code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, other validating or invalidating cause shall supplement its provisions."
Thus, Florida law provides that common-law principles are intended to supplement the UCC, unless those common-law principles are displaced by a particular provision or provisions of the UCC.[8]
In Corfan Banco Asuncion Paraguay v. Ocean Bank, 715 So.2d 967 (Fla.Dist.Ct. App.1998), and Burtman v. Technical Chemicals & Products, 724 So.2d 672 (Fla. Dist.Ct.App.1999), Florida courts applied § 671.103, although not to the same UCC provisions in issue here. However, we can glean some guidance from those cases. In Corfan Banco, the Florida District Court of Appeals held that § 670.207, Fla. Stat. Ann. (West 2004), displaced a common-law negligence claim arising out of a wire transfer of funds between banks. The Corfan Banco court compared the allegations in the pleadings relating to the negligence claim and the UCC claim and concluded that the duty Corfan Banco claimed in its negligence count that Ocean Bank breached was the same duty established and governed by the UCC.
*1065 In a footnote, the Corfan Banco court stated:
"We note that allowing a negligence claim in this case would `create rights, duties and liabilities inconsistent' with those set forth in section 670.207. In a negligence cause of action, Ocean Bank would be entitled to defend on a theory of comparative negligence because Corfan Bank provided the erroneous account number which created the problem at issue and then initiated the second transfer without communicating with Ocean Bank. Section 670.207 does not contemplate such a defense. (Oddly enough, allowing Corfan Bank's negligence claim in this case might actually inure to Ocean Bank's benefit.) As explained in the comment, one of the primary purposes of the section is to enable the parties to wire funds transfers to predict risk with certainty and to insure against risk. The uniformity and certainty sought by the statute for these transactions could not possibly exist if parties could opt to sue by way of pre-Code remedies where the statute has specifically defined the duties, rights and liabilities of the parties."
715 So.2d at 971 n. 5. For these reasons, the Florida District Court of Appeals held that Florida's version of the UCC displaced Corfan Banco's negligence claim. 715 So.2d at 971.
In Burtman, the Florida District Court of Appeals was required to determine whether § 678.401 of Florida's version of the UCC, which expressly authorized an injured party to seek monetary damages as well as an injunction, displaced the common-law rule that injunctive relief was available to a party only when the party had no other adequate remedy at law to make him whole. In Burtman, the defendant argued that if monetary damages were available to the plaintiff, then the plaintiff had an otherwise adequate remedy and that, under the common law, the plaintiff was barred from pursuing both an injunction and monetary damages.
The Burtman court held that § 678.401 of Florida's version of the UCC "displaced" the common-law limitations applicable to injunctive relief and that under § 678.401 the plaintiff was, therefore, entitled to pursue both monetary damages and an injunction. The Burtman court stated:
"The concept of `displacement' allows the Code to abrogate common law rules without requiring unequivocal, explicit reference to the common law in each statutory section that effects a modification. As the supreme court has observed, `[a]lthough general principles of law and equity are applicable to supplement the provisions of the code, they will not prevail when in conflict with code provisions.' Weiner v. American Petrofina Mktg., Inc., 482 So.2d 1362, 1364 (Fla.1986). In subsection (2), Section 678.401 `displaces' the common law rule that there can be no injunction where an action for damages will lie, by allowing for damages in addition to the relief made available through subsection (1). The reading urged by appellees would nullify the word `also' in subsection (2) and amount to an impermissible rewriting of the statute through creative construction."
724 So.2d at 676. Thus, Burtman stands for the principle that displacement of a common-law rule under the UCC does not require an unequivocal, explicit reference to the common-law rule being displaced. If the UCC provision conflicts with the common law in some way, the common law must be said to be displaced.
We now apply the principles of displacement, previously recognized by the Florida courts, to determine if Tice's *1066 common-law claims of negligence and wantonness under Alabama law have been displaced by his claims asserted under Florida's version of the UCC. Even if the applicable Florida UCC sections do not expressly preempt the common-law negligence and wantonness claims asserted by Tice, those common-law claims are displaced or preempted if allowing the common-law claims would "create rights, duties and liabilities inconsistent" with those set forth in § 674.402 and § 674.404. Corfan Banco, supra; Burtman, supra.
In this case, Tice alleged that AmSouth and its employees breached the duty established in § 674.402, Fla. Stat. Ann. (West 1993). Section 674.402 provides, in pertinent part:
"§ 674.402. Bank's liability to customer for wrongful dishonor. ...
"(1) Except as otherwise provided in this chapter, a payor bank wrongfully dishonors an item if it dishonors an item that is properly payable, but a bank may dishonor an item that would create an overdraft unless it has agreed to pay the overdraft."
Thus, the duty established in § 674.402 required AmSouth not to dishonor an item that was properly payable. Tice maintains that his checks to Manheim's were "properly payable" and that AmSouth breached its duty to him by dishonoring those checks.
Tice also alleged that AmSouth and its employees violated § 674.404, Fla. Stat. Ann. (West 1993). That UCC provision provides:
"§ 674.404. Bank not obliged to pay check more than 6 months old.

"A bank is under no obligation to a customer having a checking account to pay a check, other than a certified check, which is presented more than 6 months after its date; but it may charge its customer's account for a payment made thereafter in good faith."
Thus, under this provision AmSouth could properly pay a stale-dated check, but it could do so only if it was acting in good faith.
In addition to his claims asserted under the UCC, Tice alleged that AmSouth acted negligently or wantonly by paying the stale-dated checks and by wrongfully dishonoring Tice's properly presented checks to Manheim's. In order to establish his common-law negligence claims, Tice was required to establish that AmSouth owed him a duty, that AmSouth breached that duty, and that Tice was injured as a proximate cause of that breach. Flagstar Enters., Inc. v. Davis, 709 So.2d 1132 (Ala. 1997). In order to establish his common-law wantonness claims, Tice was required to establish that, with reckless indifference to the consequences, AmSouth consciously or intentionally did some wrongful act or omitted some known duty and that that act or omission produced Tice's injury. Kennedy v. Jack Smith Enters., Inc., 619 So.2d 1326 (Ala.1993).
Will allowing the common-law claims in this case to proceed "create rights, duties and liabilities inconsistent" with the statutory scheme adopted in Florida's version of the UCC? If the answer to this question is yes, then we must conclude that the UCC displaces or preempts Tice's common-law claims.
We conclude that Tice's negligence and wantonness claims are displaced by his UCC claims for several reasons. First, under § 674.402, Tice's claim that AmSouth wrongfully dishonored a properly presented check could be established by any showing of an improper dishonor by AmSouth, whether that showing involved a mere breach of ordinary care (negligence), reckless disregard (wantonness), or an intentional *1067 action or omission by AmSouth. Therefore, the fact that the drafters of § 674.402 concluded that a bank should be strictly liable for the wrongful dishonor of a properly payable item, regardless of the bank's intent and regardless of the element of wrongdoing, indicates that the drafters did not intend a bank to also be held liable in negligence or in wantonness for the same acts or omissions that gave rise to the wrongful-dishonor claim. Therefore, allowing the common-law claims to proceed in this instance would create rights, duties, and liabilities inconsistent with the statutory scheme created by Florida's version of the UCC.
Additionally, allowing Tice's common-law claims of negligence and wantonness to proceed would be inconsistent with the statutory scheme created by the UCC because, other than the duty established in the UCC, Tice cannot establish that AmSouth owed him a duty not to dishonor his checks. Tice argued that his claims of negligence and wantonness were premised not upon a duty set out in the UCC but upon a duty that AmSouth itself adopted in its manual setting out the guidelines for its tellers when handling checks; this argument, however, is unfounded. Tice argued that the guidelines set forth in the manual were adopted and incorporated into his "Customer Account Agreement" with AmSouth and that because AmSouth's employees did not follow those guidelines in paying the stale-dated checks presented on his account AmSouth had breached a duty that existed separate and distinct from the duty established in the UCC, giving rise, he argued, to his negligence and wantonness claims under Alabama common law.
We first note that if the guidelines set forth in the manual had been adopted and incorporated into Tice's Customer Account Agreement and if AmSouth failed to honor the terms of its Customer Account Agreement, such a failure would give rise to a breach-of-contract action against AmSouth rather than to a claim of negligence or wantonness. Secondly, we note that AmSouth's teller manual was introduced at trial specifically as evidence of what would have constituted "reasonable standards of fair dealing" by AmSouth. Such evidence was relevant to determining whether AmSouth had acted in "good faith," which, in turn, was relevant to determining if AmSouth had breached the duty established in § 674.404, Fla. Stat. Ann. (West 1993).
We cannot allow AmSouth's internal manual to constitute evidence of a duty created under the UCC and to constitute evidence of a separate duty created under the common law without running afoul of § 671.103, Fla. Stat. Ann. (West 2004). We conclude that the AmSouth manual providing guidelines for its tellers was not sufficient evidence to establish a duty of care running from AmSouth to Tice separate and distinct from the duty created under the UCC. We do not address in this opinion the issue whether the manual was or was not adopted and incorporated into AmSouth's Customer Account Agreement.
Additionally, we note that Article 4 of the UCC was intended to govern the relationship between a bank and its depositor. Allowing Tice to recover under common-law theories, when the very conduct on which he bases the claims he makes under those theories is specifically addressed by the UCC, would constitute an unwarranted infringement upon the statutory scheme set forth in the UCC and would, for obvious reasons, create rights, duties, and liabilities inconsistent with the UCC.
For example, under the facts of this case, we cannot distinguish between the elements of Tice's wantonness claim based upon the payment of the stale-dated checks and the elements of his UCC claim asserted under § 674.404, Fla. Stat. Ann. *1068 (West 1993). Allowing AmSouth to be subject to liability on both of those claims for the same action would be at odds with the purpose of the UCC  to establish a uniform standard of behavior for a transaction between banks and their customers. This is best demonstrated by considering that a jury could not return a verdict against AmSouth on the UCC claim asserted under § 674.404 and still find that AmSouth had not acted "with reckless disregard" for Tice's rights. Stated differently, if Tice was able to establish that AmSouth or its employees acted with reckless disregard for the rights of others, AmSouth could not have been acting in "good faith." Thus, a finding of liability against AmSouth on the wantonness claim required a finding of liability against AmSouth on the § 674.404 claim. Conversely, if AmSouth established that it paid the stale-dated checks in "good faith," then it could not have been acting with reckless disregard for Tice's rights in paying those checks and Tice's wantonness claim would fail.
We also conclude that allowing Tice's common-law claims of negligence would "create rights, duties and liabilities inconsistent" with those set forth in § 674.402 and § 674.404, Fla. Stat. Ann. (West 1993). Under Alabama common law, contributory negligence and assumption of the risk are defenses to a negligence claim. However, § 674.402 and § 674.404 do not contemplate such defenses to the violations of those sections.[9]
As addressed above, we recognize that the UCC intended that the common law would supplement its provisions, except where the common law had been displaced by the provisions of the UCC. However, the fact that a remedy has been provided by the UCC for the very same acts or omissions made the basis of Tice's common-law claims compels the conclusion that those common-law claims are duplicative and have been displaced by his UCC claims.
In summary, we conclude that allowing Tice to assert common-law claims of negligence and wantonness would "create rights, duties and liabilities inconsistent" with those set forth in § 674.402 and § 674.404. Those common-law claims are therefore displaced by the claims asserted under Florida's version of the UCC.
Because we have concluded that Tice's negligence and wantonness claims are displaced by his UCC claims, we necessarily conclude that the trial court erred in submitting the common-law claims to the jury.[10] Additionally, because the jury returned a general verdict in favor of Tice, we are unable to determine whether the damages awarded by the jury were based on the good counts  the UCC claims  or the bad counts  the negligence and wantonness claims. For these reasons, we must reverse the judgment entered on the jury's verdict and remand this action for a new trial on Tice's UCC claims only. See Aspinwall v. Gowens, 405 So.2d 134, 137 (Ala.1981). Based on our resolution of this case, we pretermit discussion of the other issues presented on appeal by AmSouth.
REVERSED AND REMANDED.
NABERS, C.J., and SEE, HARWOOD, SMITH, and BOLIN, JJ., concur.
LYONS, WOODALL, and PARKER, JJ., concur in the result.
NOTES
[1] Tice testified that he was unaware of those time limitations. However, at the trial, AmSouth presented evidence indicating that the information was contained in the Customer Account Agreement and that AmSouth sent a stop-payment notice to Tice informing him when the stop-payment orders would expire.
[2] An "official check" of the bank represents an unconditional promise by the bank to pay the amount shown on the check.
[3] The actual name of this company was Greater Gulf Coast Auto Auction, Inc., d/b/a Manheim's Greater New Orleans Auto Auction. Manheim's operates numerous auctions nationwide.
[4] Tice described the "KO" book as a "knockout" book used by all the automobile-auction companies. Once an auction participant issues a bad check, the participant's name is listed in the "KO" book to notify the other auctions that the participant should be banned from further participation. Brandon Walton, vice president of Auction Insurance Agency, testified that the KO book is a listing of "uninsurable" dealers.
[5] Tice also alleged fraud, suppression, civil conspiracy, and intentional interference with business relations. The trial court entered a judgment as a matter of law for AmSouth on those claims before the case was submitted to the jury.
[6] The amount the jury awarded Tice for out-of-pocket expenses was $1.00 less than the amount of the judgment entered against Tice in favor of Manheim's for attorney fees, pre-judgment interest, and costs incurred by Manheim's.
[7] We have reviewed the Florida Rules of Appellate Procedure; they contain no provision under which we may submit a certified question to a Florida appellate court from another state court. Compare Rule 9.150, Fla. R.App. P., Discretionary Proceedings to Review Certified Questions from Federal Courts.
[8] We note that Tice's UCC claims invoke Florida law while his negligence and wantonness claims invoke Alabama common law. This particular nuance, however, does not affect our analysis of the displacement issue.
[9] AmSouth raised these affirmative defenses in its answer.
[10] AmSouth argued this point before the trial court in its motion for a JML made at the close of Tice's case-in-chief and again at the close of all the evidence.