This commercial case involves a transfer of funds from one account at AmSouth Bank to another account at AmSouth Bank. Fred Fitts and Bellann Fitts, husband and wife, sued AmSouth Bank and James "Ronnie" George, a business associate of the Fittses, asserting various common-law claims. The trial court entered a summary judgment in favor of AmSouth Bank and George, holding that the Fittses' action was barred by the one-year statute of repose found at § 7-4A-505, Ala. Code 1975. The Fittses appeal; we affirm.
 Facts
In October 2000, Fred Fitts and Bellann Fitts and James "Ronnie" George began a new business marketing and distributing a herbal alternative to Viagra, a medicine used to treat male impotency. They named their company "Enhance for Life" ("EFL"). The company was not originally incorporated.
Once EFL was formed, the Fittses opened a checking account at AmSouth Bank ("the first account") in the name of "Enhance for Life." The Fittses were the only named signatories on the first account. AmSouth Bank gave the Fittses its "Customer Agreement for Depository Accounts," which governs the use of any depository account. This agreement was between AmSouth and the account holder, which in this case, was EFL. The Fittses deposited into this account checks made out to EFL and used the account to pay the business expenses of EFL.
In November 2000, Fred Fitts, James "Ronnie" George, and another party, Chalmus Weathers, entered into a pre-incorporation agreement. Under the terms of this agreement, Fitts, George, and Weathers agreed that EFL would be incorporated and that they would own equal shares of the EFL stock to be issued upon incorporation, that Fitts would receive a 20% fee from the receivables generated from the sales and renewals of distribution areas, and that George was to be the president of EFL.
The business opened a second account at AmSouth ("the second account") under the name of "Enhance for Life, Inc."[1]
Fred Fitts testified that EFL, the same business that had begun operating in October 2000, was the owner of the second account. *Page 820 
The signatories on the second account were the Fittses (Fred and Bellann), as well as George. Once the second account was opened, EFL began to deposit its checks into this account and use the account to pay its bills.
Fred Fitts testified that he did not close the first account after the second account was opened, but he used it "very little." However, he then acknowledged that he used the first account to "recoup our [research and development] expenses that we had had for over a year." He explained that he would sometimes write himself a check out of the second account and then deposit the check into the first account. He also explained that, in order to recoup the 20% commission to which he was entitled, he would deposit some of the receivables for EFL, Inc., directly into the first account. He testified that doing that was easier than depositing the check written to EFL, Inc., into the second account and then writing himself a check from that account and depositing it into the first account.[2]
EFL, Inc., was incorporated on February 14, 2001. George was named in the articles of incorporation as the sole director and as the incorporator.[3] In April 2001, Fred Fitts and George entered into a second agreement.[4] Under this agreement, 100% of the stock in EFL, Inc., would be issued to George, but Fitts had the right to demand issuance to him of 50% of the outstanding stock at any time. This second agreement also provided that Fitts would be paid a fee of 20% of the revenue from the sale and renewals of distribution areas and that EFL, Inc., would pay $5,000 per month to an entity known as "Sunny Days" for the consulting services of Fred Fitts and Bellann Fitts.[5]
George testified that on April 21, 2001, he discovered for the first time that the first account was still active and that checks made out to EFL, Inc., were being deposited directly into that account.[6] He testified that he obtained copies of these checks that had been deposited in the first account and saw that the funds deposited into that account had been used to purchase automobiles. On April 24, 2001, George caused AmSouth Bank to transfer $85,000 from the first account to an EFL account he opened ("the third account"). George was the sole signatory on this third account. The transfer of the $85,000 was requested by a written debit slip, completed and signed by George, on which he directed AmSouth to transfer $85,000 from the first account to the third account. George claimed that at the time he requested the transfer of the $85,000, he *Page 821 
thought he was a signatory on the first account.
On April 26, 2001, George met with the Fittses and questioned them about the first account. He accused them of embezzlement; he terminated their relationship with EFL, Inc.; and he demanded that they return all property of EFL, Inc.
It is undisputed that Fred Fitts learned of AmSouth's transfer of $85,000 to the third account on George's instruction, at the latest, in mid-May 2001. Fitts did not object to the transfer, and he filed no formal complaint with AmSouth at that time. He testified that he was not worried about it and that he "didn't have to have [the money] at that time." On May 8, 2001, the Fittses and George entered into an agreement terminating their relationship. George, on behalf of EFL, Inc., agreed to pay the Fittses $200,000 in exchange for the Fittses' waiver of "any further right to claim and/or to accept any fees on collected funds from the sale of sales areas for [EFL, Inc.] or any right to any fees on any annual sales renewals for [EFL, Inc.]" and to waive "any right to claim any past due development fees, management fees, commissions or wages from [EFL, Inc.]."
On April 23, 2003, almost two years after he first learned of the transfer of the $85,000 to the third account, Fred Fitts completed an affidavit of forgery, making a claim against AmSouth for the $85,000. In that affidavit, Fitts identified the claimant as "Enhance for Life," and he swore that George's signature on the $85,000 transfer order was unauthorized. On that same date, Fred and Bellann Fitts sued AmSouth Bank in the Jefferson Circuit Court, asserting common-law claims of breach of contract and negligence relating to the transfer of the $85,000. The Fittses later amended their complaint, adding common-law claims of suppression, wantonness, and conspiracy. AmSouth Bank filed a third-party complaint against George, seeking indemnification for the $85,000 transfer.
AmSouth filed a motion for a summary judgment on August 20, 2004. George also filed a motion for summary judgment. The trial court entered summary judgments in favor of both AmSouth and George. The trial court held that the one-year statute of repose found in § 7-4A-505 precluded the Fittses' claims against AmSouth and, by virtue of that fact, entitled AmSouth and George to a judgment as a matter of law. The Fittses filed a motion to vacate the judgment, which the trial court denied. The Fittses appeal.
 Standard of Review
"We review the trial court's entry of a summary judgment de novo, and our standard of review is well settled.
 "`In reviewing the disposition of a motion for summary judgment, "we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact," Bussey v. John Deere Co., 531 So.2d 860, 862
(Ala. 1988), and whether the movant was "entitled to a judgment as a matter of law." Wright v. Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." Wright, 654 So.2d at 543 (quoting West v. Founders *Page 822 Life Assurance Co. of Florida, 547 So.2d 870, 871
(Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990).'
 "Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997)."
Hollingsworth v. City of Rainbow City, 826 So.2d 787, 789 (Ala. 2001).
 Analysis
The Fittses first argue that the transfer at issue — the transfer of $85,000 from the first account to the third account — does not fall within the scope of Article 4A of Alabama's version of the Uniform Commercial Code ("the UCC"). The Fittses also argue that the trial court improperly applied the statute of repose, which they say is embedded within the UCC and applicable only to UCC claims, to their common-law claims. We address these arguments together.
 The Applicability of Article 4A
The Fittses first argue that AmSouth's transfer of the $85,000 is not within the scope of Article 4A of the Alabama Commercial Code. We disagree.
Article 4A governs "funds transfers." A "funds transfer" is defined as "the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order." § 7-4A-104(a), Ala. Code 1975. A "payment order" is defined as "an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary" under certain circumstances. § 7-4A-103(a)(1), Ala. Code 1975. The "sender" is "the person giving the instruction to the receiving bank." §7-4A-103(a)(5), Ala. Code 1975. The "receiving bank" is "the bank to which the sender's instruction is addressed." §7-4A-103(a)(4), Ala. Code 1975. Article 4A also refers to a "sender" as an "originator." See § 7-4A-104(c), Ala. Code 1975. The "beneficiary" is "the person to be paid by the beneficiary's bank." § 7-4A-103(a)(2), Ala. Code 1975. The "beneficiary's bank" is "the bank identified in a payment order in which an account of the beneficiary is to be credited. . . ." § 7-4A-103(a)(3), Ala. Code 1975.
As the trial court correctly noted, the "originator" and the "beneficiary" may be the same person or the same entity. "In some cases, the Originator and the Beneficiary may be the same person. This will occur, for example, when a corporation orders a bank to transfer funds from an account of the corporation in that bank to another account of the corporation in that bank or in some other bank." Official Comment to § 7-4A-104, Ala. Code 1975. As discussed in the Official Comment, a receiving bank may also serve as the beneficiary's bank.
In this case, George requested that AmSouth transfer funds, through the banking system, from one EFL account to another EFL account. George was the sender and the originator in the transaction; AmSouth was the receiving bank. AmSouth was also the beneficiary's bank. EFL, Inc., the owner of the third account, was the beneficiary of the payment order. When AmSouth issued the payment order, it debited the first account in the amount of $85,000 and credited the third account in that same amount. By debiting the first account in the amount of the withdrawal, AmSouth gave notice to the first account, *Page 823 
and to the Fittses, of the $85,000 withdrawal. This overall transaction is referred to as a "funds transfer," and it is governed by Article 4A. See Official Comment to § 7-4A-104, Ala. Code 1975. Thus, we disagree with the Fittses; Article 4A governs this transaction.
 Displacement by Article 4A of the Common-Law Claims
AmSouth argued before the trial court that Article 4A displaced the Fittses' common-law claims. The trial court concluded that it did not need to address that argument because the statute of repose in § 7-4A-505, Ala. Code 1975, barred any claim not brought within one year of learning of an improper transfer. The Fittses argue that the trial court improperly imported the statute of repose from § 7-4A-505, Ala. Code 1975, and applied it to common-law claims that, the Fittses say, carry their own statute of limitations.
We agree with the result reached by the trial court but not with its reasoning. If the one-year statute of repose is to be applied to bar the Fittses' common-law claims, then Article 4A must displace those common-law claims. In other words, the one-year statute of repose found in Article 4A cannot properly be applied to bar the common-law claims unless Article 4A displaces those common-law claims. We conclude that Article 4A has displaced those common-law claims.
Article 4A of the UCC addresses "Funds Transfers." As the Official Comment to § 7-4A-102, Ala. Code 1975, recognizes:
 "The funds transfer governed by Article 4A is in large part a product of recent and developing technological changes. Before this Article was drafted there was no comprehensive body of law — statutory or judicial — that defined the juridical nature of a funds transfer of the rights and obligations flowing from payment orders. Judicial authority with respect to funds transfers is sparse, undeveloped and not uniform. Judges have had to resolve disputes by referring to general principles of common law or equity, or they have sought guidance in statutes such as Article 4 which are applicable to other payment methods. But attempts to define rights and obligations in funds transfers by general principles or by analogy to rights and obligations in negotiable instrument law or the law of check collection have not been satisfactory.
 "In the drafting of Article 4A, a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment. A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles. In the drafting of these rules, a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately. This consideration is particularly important given the very large amounts of money that are involved in funds transfers.
 "Funds transfers involve competing interests — those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. The rules that emerged represent a careful and delicate balancing of *Page 824 
those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this article."
This language suggests that if the situation made the basis of a dispute is addressed in Article 4A, then the provisions of Article 4A provide the exclusive rights and remedies of the parties involved. See also Corfan Banco Asuncion Paraguay v.Ocean Bank, 715 So.2d 967, 971 (Fla.Dist.Ct.App. 1998) (the Official Comment to § 102 of Article 4A of the UCC "suggests the exclusivity of Article 4A as a remedy. Although the commentary to the UCC is not controlling authority, we are persuaded by the expressed intent of the drafters" (citation omitted)).
Because the situation made the basis of the Fittses' common-law claims — that AmSouth made an improper funds transfer — is unequivocally addressed in the particular provisions of Article 4A, we conclude that those common-law claims are displaced by Article 4A[7] and that the Fittses' exclusive remedy for that claim must be found in Article 4A.
We also conclude that the trial court properly applied §7-4A-505, Ala. Code 1975, to the facts of this case. It is undisputed that the Fittses learned of the transfer of $85,000, at the latest, in mid-May 2001. They did not contest the funds transfer until some two years later. Therefore, under the express language of § 7-4A-505, Ala. Code 1975, they are precluded from proceeding against AmSouth to recover for the alleged improper funds transfer.[8] We conclude that the trial court properly applied § 7-4A-505, Ala. Code 1975, in this case although we conclude *Page 825 
that § 7-4A-505 was applicable for a different reason than stated by the trial court.
We conclude that Article 4A displaced the Fittses' common-law claims; we also conclude that the trial court properly applied §7-4A-505, Ala. Code 1975, to preclude the Fittses from proceeding against AmSouth. Because the Fittses have no viable claims against AmSouth, the trial court properly entered a summary judgment for George on AmSouth's third-party complaint. We affirm the summary judgment in favor of AmSouth and in favor of George, although we do so on different grounds than the trial court gave for entering those summary judgments.
AFFIRMED.
NABERS, C.J., and HARWOOD, WOODALL, and BOLIN, JJ., concur.
[1] Although the account was opened in the name of "Enhance for Life, Inc.," the business had not yet been incorporated when the account was opened.
[2] Although the record is unclear, it appears that the Fittses did not maintain records of the total income of EFL, Inc., the amount Fred Fitts calculated as his 20% commission, and the amount of income of EFL, Inc., he was diverting to the first account.
[3] George denied knowing about the incorporation.
[4] George testified that Chalmus Weathers was no longer involved in the business and that the Fittses and George had to redraft the paperwork to reflect that fact.
[5] Bellann Fitts testified that "Sunny Days" is an "account that [the Fittses] have at AmSouth." She stated that Sunny Days is not a business and does not file tax returns but is simply an operating account the Fittses use to pay their personal bills and into which they deposit income from their various business ventures.
[6] George testified that he made the discovery when he enrolled in Internet banking. When he logged onto EFL's online accounts, the first account was listed under EFL's tax identification number, along with the other account, and was shown as active. George then began investigating the first account. He viewed the activity in the account and saw that $100,000 had been deposited in the first account the week before.
[7] We normally would look to § 7-1-103, Ala. Code 1975, for guidance on the relationship between the UCC and the common law. Section 7-1-103, Ala. Code 1975, provides:
 "Unless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant and the law relative to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."
Under § 7-1-103, Ala. Code 1975, common-law principles are intended to supplement the UCC, unless those common-law principles are displaced by a particular provision or provisions of the UCC. However, because we conclude that the drafters of Article 4A intended for the rules and procedures set forth in that Article to displace the common law in any situation covered by the provisions of the Article, we need not decide this case under § 7-1-103, Ala. Code 1975.
[8] Section 7-4A-505, Ala. Code 1975, provides:
 "If a receiving bank has received payment from its customer with respect to a payment order issued in the name of the customer as sender and accepted by the bank, and the customer received notification reasonably identifying the order, the customer is precluded from asserting that the bank is not entitled to retain the payment unless the customer notifies the bank of the customer's objection to the payment within one year after the notification was received by the customer."
As stated in the Official Comment to § 7-4A-505:
 "This section is in the nature of a statute of repose for objecting to debits made to the customer's account. . . . [T]he obligation to refund may not be asserted by the customer if the customer has not objected to the debiting of the account within one year after the customer received notification of the debit."
Because it is undisputed that the Fittses did not file an objection to the $85,000 transfer until more than one year after they received notice of the transfer, they are precluded from contesting the debit to the first account.