On Applications for Rehearing

MURDOCK, Justice.
This Court’s opinion of July 31, 2009, is withdrawn, and the following opinion is substituted therefor.
Retha J. Brannon, as executrix of the estate of Lemuel Morrison, deceased (“the Morrison estate”), the plaintiff below, appeals from a judgment as a matter of law in favor of BankTrust, Inc. (“BankTrust”), on the Morrison estate’s common-law tort claims of negligence and wantonness (case no. 1060637). BankTrust cross-appeals from a summary judgment in favor of Brannon on the Morrison estate’s claim of breach of contract (case no. 1061059). We reverse both judgments.

I. Facts and Procedural History

Morrison died in March 2001, and Bran-non was appointed executrix of his estate. After her appointment as executrix, Bran-non retained Douglas McCoy of the law firm of Hand Arendall, LLC, to assist her in the administration of the Morrison estate. Because Hand Arendall maintained its own account at BankTrust and had regularly done business with it, McCoy recommended that Brannon open a checking account for the Morrison estate at BankTrust. On June 26, 2001, Brannon and McCoy met with Lyn Peterson, a vice president of BankTrust, and Brannon opened a checking account (“the estate account”) by filling out an information sheet and signing a signature card. Attached to the signature card was a document entitled “Deposit Account Terms and Conditions” (“the agreement”), which provided that the “terms [of the agreement] governed] the operation of this account unless supplemented in writing.” The agreement specified that,
“[u]nless otherwise clearly indicated on the account records, any one of you who signs this form including authorized signers, may withdraw or transfer all or any part of the account balance at any time.... Each [signatory] authorizes each other person signing this form to endorse any item payable to you or your order for deposit to this account or any other transaction with [BankTrust].”
The agreement also provided that the signatory on the account must review bank statements with “reasonable promptness” and must “promptly notify” BankTrust of any “unauthorized payments or alterations.” The agreement provided, in addition to the foregoing, that no claim for an unauthorized transaction could be made *400 more than 60 days beyond the date Bank-Trust made available to the signatory a statement reflecting that transaction.
The signature card contained spaces for multiple signatories, but it is undisputed that Brannon was the only person whose name appears on the signature card as a signatory. The signature card also included the option for making an “agency designation,” but no such designation was made on the signature card.
Although McCoy’s name does not appear on the signature card, Peterson testified by deposition that Brannon told her that “Doug [McCoy] would handle this account for her.” Brannon instructed Peterson to send checks for the estate account to McCoy, and she listed the mailing address as “Estate of Lemuel Morrison, c/o Douglas L. McCoy,” followed by Hand Ar-endall’s mailing address. It is undisputed that McCoy initially received all bank statements for the estate account and that he had a responsibility to Brannon to forward them to her.
On April 17, 2002, McCoy telephoned Peterson at BankTrust and told her to transfer $34,821.73 from the estate account to Hand Arendall’s account at BankTrust. Peterson testified that McCoy told her that the transfer was for legal fees and that he said nothing else. Peterson did not ask McCoy if he had authorization from Brannon for the transfer, and McCoy did not tell Peterson that he had such authorization. Their conversation lasted less than one minute. Peterson testified that she “assumed” that McCoy had authorization for the transfer and that she trusted McCoy.[1] Thereafter, in May, June, July, August, September, and October 2002, McCoy placed similar telephone calls to Peterson and obtained transfers of varying amounts from the estate account to Hand Arendall’s account. In all, eight separate transfers from the estate account to Hand Arendall’s account, totaling $240,185.19, were made at McCoy’s direction.
In October 2002, Brannon telephoned Peterson to inform her that she had not been receiving bank statements on the estate account, and she asked Peterson to change the address on the account. Bran-non claims that, upon receiving a printout of the bank statements from Peterson, she noticed that a large amount of money was missing from the estate account. She telephoned Peterson to inform her that there had been unauthorized transfers from the estate account to Hand Arendall, and she asked to speak to Peterson’s supervisor. Peterson transferred Brannon to Bank-Trust’s chief financial officer, Michael Johnson. Brannon demanded that Bank-Trust credit the missing funds to the estate account. Johnson told Brannon that he would get back to her.
Johnson testified that, after he received Brannon’s telephone call, he telephoned McCoy[2] for legal advice on how to handle the situation because McCoy also was one of BankTrust’s attorneys.[3] McCoy provided Johnson with “suggestions” for how to respond to Brannon’s inquiry. McCoy then drafted a response to Brannon, which Johnson printed on BankTrust’s letterhead and signed as the author. Johnson sent the letter to Brannon on January 21, 2003, explaining that the transfers were carried *401 out by Peterson on McCoy’s instructions. The letter advised Brannon that “[s]ince [BankTrust] knew of your close fiduciary relationship with Mr. McCoy, we assumed ... that his instructions to us were known to you.”
Upon receiving the letter, Brannon went to the BankTrust office and again requested that the estate account be credited for what she deemed to be McCoy’s unauthorized transfers. Upon BankTrust’s refusal, Brannon closed the account.
In October 2003, Brannon sued Bank-Trust in the Geneva Circuit Court; the complaint alleged breach of contract, negligence, and wantonness, stemming from the eight transfers of funds from the estate account to Hand Arendall’s account between April and October 2002.[4] Following a change of venue from Geneva County to Mobile County, BankTrust answered the complaint, asserting, among other things, that Brannon had not timely reviewed the estate account’s statements or notified BankTrust of the alleged problems with the account. Among other things, Bank-Trust cited the provisions of Article 4 of the Uniform Commercial Code (“the UCC”), codified at § 7-4-101 et seq.[5]
During discovery, BankTrust filed a notice of intent to serve a subpoena on a nonparty, Hand Arendall. The nonparty subpoena requested all statements, records of payment, notes, memoranda, and correspondence related to the Morrison estate and directed to or received from Brannon. Brannon objected to the non-party subpoena. BankTrust contended that it needed the information to demonstrate that Brannon owed money to Hand Arendall for legal services McCoy had rendered to the Morrison estate. In a memorandum of law responding to Brannon’s objection to BankTrust’s nonparty subpoena to Hand Arendall, BankTrust also stated that it “asserts as a factual matter that it made the transfer from the [estate] account to Hand Arendall’s account with the understanding that the transfers were authorized by [Brannon].”[6]
Brannon objected to the subpoena on the ground that the subpoena requested information plainly protected by the attorney-client privilege under Rule 502, Ala. R. Evid. She also argued that any evidence indicating that Brannon may have owed money to Hand Arendall was not relevant, she said, because the transfer was an “unauthorized transfer,” and Article 4A of the UCC (§ 7-4A-201 et seq., Ala.Code 1975) provides defenses for such transfers only in the event a bank has in place certain security measures, which, she contended, BankTrust did not have.[7] BankTrust re *402 sponded that Brannon had “waived any privilege she may have been able to invoke in connection with billing and legal fees from Hand Arendall, LLC[,] since she has accused [BankTrust] of making improper payments of those bills.”
On November 24, 2004, the trial court quashed the subpoena, finding that the requested information was protected by the attorney-client privilege and that “[w]hether [Brannon] owed the money to [the Morrison estate’s] former law firm is not relevant or material to the issue of whether the transfer [of funds] in the first instance was unauthorized.”
On December 17, 2004, BankTrust filed a motion to reconsider the trial court’s order quashing the nonparty subpoena. In this motion, it argued that in addition to demonstrating that Brannon owed money to Hand Arendall and that she had received the bank statements for the estate account from McCoy, the information requested from Hand Arendall allegedly could “be used to establish that Ms. Bran-non’s claim that the transfers were unauthorized is false.” Brannon’s response to the motion to reconsider stated that Bank-Trust’s UCC Article 4 defense would not work because Article 4 deals with negotiable instruments, while the actions at issue were transfers of funds made by telephone.
In May 2005, Brannon filed a motion for a partial summary judgment on her breach-of-contract claim. She argued that the signature card created a contract between her and BankTrust that BankTrust had breached by carrying out unauthorized transfers from the estate account to Hand ArendaH’s account and that the Morrison estate had been damaged as a result of BankTrust’s actions. The trial court set the motion for a hearing on August 12, 2005.
On August 9, 2005, BankTrust filed a response to the motion. In its response, BankTrust argued that a summary judgment should not be entered for Brannon because genuine issues of material fact existed as to whether Brannon had performed her duties and obligations under the agreement and, specifically, whether she had failed to examine the statements for the estate account with reasonable promptness and to notify BankTrust of any problems with the statements. In BankTrust’s “Motion to Continue Argument and Response to [Brannon’s] Motion for Partial Summary Judgment,” Bank-Trust argued:
“At a minimum, it will be proven, upon completion of discovery, that [a] $100,000 transfer was indeed authorized and granting [Brannon’s] Motion for Partial Summary Judgment would unjustly enrich [Brannon] and would therefore result in a windfall to her. [BankTrust] has been unable to obtain discovery that is believed will establish authorization by Ms. Brannon of all the transfers at issue.”
Furthermore, in an affidavit attached to this motion, Ginger D. Johnson, a lawyer who identified herself as representing BankTrust, testified as follows:
“2. BankTrust’s Notice of Intent to Serve Nonparty Subpoena on Hand Ar-endall, LLC, was served on June 15, 2004....
“3. [Brannon] filed an Objection to the Non-party Subpoena to Hand Arendall, LLC on June 21, 2004, and BankTrust filed a response to the same on July 9, 2004. These issues were argued before the Court on November 19, 2004. This Honorable Court sustained [Brannon’s] *403 objection to the issuance of the nonparty subpoena on November 24, 2004, and BankTrust subsequently filed Motion to Reconsider the Court’s ruling on December 17, 2004. Subsequent to that date, the issues were fully argued and briefed by the parties. Since that time, the motion has been under submission.
“4. As a result of the discovery disputes, the resolution of which are under submission with this Court, [BankTrust] does not have the following:
“(A) Interrogatory answers and responses to the Request for Production from [Brannon];
“(B) The deposition of [Brannon];
“(C) The deposition of Stephanie Ell-rich, [Brannon’s] CPA;
“(D) Responses to the Civil Subpoena requested by [BankTrust] to be served on Hand Arendall, LLC;
“(E) The deposition of Douglas McCoy; ...
“5. BankTrust believes that the transfers were authorized by [Brannon] but has not been able to engage in discovery on that and related issues and therefore is not able to adequately respond to [Brannon’s] motion for partial summary judgment at this point in time.”
As planned, the trial court heard oral arguments on Brannon’s motion for a partial summary judgment on August 12, 2005. The trial court denied BankTrust’s request for a continuance and granted Brannon’s motion for a partial summary judgment as to her breach-of-contract claim.
On August 18, 2005, the trial court received, unsolicited, a large envelope from Hand Arendall for the Court’s in camera review. Both parties objected to the submission, and the trial court returned the envelope to Hand Arendall without examining its contents. On August 24, 2005, an attorney from Hand Arendall delivered to BankTrust’s counsel an affidavit from McCoy with documents attached. Bank-Trust filed the affidavit and documents, purportedly to supplement its opposition to Brannon’s motion for a partial summary judgment. In the affidavit, McCoy averred that Brannon had authorized him to make the transfers and stated that the attachments to the affidavit documented that authorization. Brannon filed a motion to strike the affidavit and attachments as untimely filed. Subsequently, BankTrust filed a motion for a summary judgment on Brannon’s tort claims.
The trial court held a hearing on the various pending motions, and on July 31, 2006, it issued a written order affirming its granting of Brannon’s motion for a partial summary judgment, denying BankTrust’s motion for a summary judgment, and granting Brannon’s motion to strike Bank-Trust’s filing of the McCoy affidavit and its attachments as untimely. Concerning Brannon’s breach-of-contract claim, the trial court specifically found that Bank-Trust “allowed a non-signatory to transfer money from the [estate] account into the non-signatory’s bank account”; that “the signing of the signature card creates a binding contract on the parties”; and that “[t]he eight separate transactions ... were unauthorized under the terms of the contract, i.e., the signature card, and constituted a breach of [BankTrust’s] contract with [Brannon].” The trial court noted that the transfers were carried out by telephone and that they did not involve negotiable instruments. “Thus, [Bank-Trust’s] assertion of § 7-4^106, Code of Alabama, 1975, as a special defense is inapplicable in this case. See Ala.Code § 7-4A-104, Official Comment.” The trial court awarded Brannon the amount of the transfers plus prejudgment interest at 6% per annum, for a total judgment of $294,552.37.
*404 BankTrust filed a motion to alter, amend, or vacate the judgment, arguing that under § 7-4A-202, Ala.Code 1975, Brannon was not entitled to interest on any of the transfers that occurred before June 1, 2002, because, it argued, Brannon had exceeded the “reasonable time” for notifying BankTrust of any problems with those transactions. It also contended that the trial court had erred in applying a 6% rate of interest to the judgment because § 7-4A-506, Ala.Code 1975, provides that the rate of interest is to be the federal-funds rate. The trial court denied Bank-Trust’s motion on September 11, 2006.
The trial court set the negligence and wantonness claims for trial on January 8, 2007. During a pretrial hearing on January 4, 2007, the trial court stated that it had just become aware of Fitts v. AmSouth Bank, 917 So.2d 818 (Ala.2005), and it asked the parties to explain the possible applicability of Fitts to this case. The parties argued as to whether Fitts dictates that the tort claims were precluded under Article 4A of the UCC, but the trial court decided to postpone any decision on the issue until a motion for a judgment as a matter of law was filed at the close of Brannon’s case. The next day, BankTrust filed an amended answer to Brannon’s complaint in which it asserted Article 4A as a defense to Brannon’s claims.
On the first day of trial, January 8, 2007, Brannon filed a motion to strike Bank-Trust’s amended answer. Without ruling on this motion, the trial court began the trial, and the jury then heard Brannon’s case on the tort claims. On January 10, 2007, following the close of Brannon’s case, BankTrust filed a motion for a judgment as a matter of law, asserting that Article 4A of the UCC, § 7-4A-101 et seq., Ala. Code 1975, displaced Brannon’s common-law tort claims and, in addition, arguing insufficiency of the evidence with respect to Brannon’s wantonness claim. Following further arguments on the displacement issue, the trial court granted BankTrust’s motion. It also granted Brannon’s motion to strike BankTrust’s amended answer as untimely filed.
Brannon appealed as to the judgment as a matter of law on her negligence and wantonness claims; BankTrust cross-appealed as to the partial summary judgment against it on Brannon’s breach-of-contract claim.

II. Standards of Review

This Court explained the standard of review applicable to a ruling on a judgment as a matter of law in Waddell & Reed, Inc. v. United Investors Life Insurance Co., 875 So.2d 1143, 1152 (Ala.2003):
‘When reviewing a ruling on a motion for a [judgment as a matter of law], this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a [judgment as a matter of law]. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a [judgment as a matter of law]. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a [judgment as a matter of law], this Court views the evidence in the light most favorable to *405 the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling.”
The standard of review for a ruling on a motion for a summary judgment is also well settled:
“ ‘A summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present “substantial evidence” creating a genuine issue of material fact — “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” Ala.Code 1975, § 12-21-12; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).’
“Questions of law are reviewed de novo."
Pritchett v. ICN Med. Alliance, Inc., 938 So.2d 933, 935 (Ala.2006) (quoting Capital Alliance Ins. Co. v. Thorough-Clean, Inc., 639 So.2d 1349, 1350 (Ala.1994)).

III. Analysis

A. BankTrust’s Cross-Appeal of the Partial Summary Judgment (case no. 1061059)

BankTrust cross-appeals from the partial summary judgment the trial court entered on Brannon’s breach-of-contract claim. BankTrust contends, among other things, that a genuine issue of fact exists as to whether Brannon fulfilled her responsibility to timely notify BankTrust in the event of an unauthorized payment from the estate account. It also argues that the record contains substantial evidence indicating that McCoy’s request to BankTrust for payment of legal fees from the estate account fell within the authority granted to him by Brannon. At a minimum, according to BankTrust, the trial court’s consideration of Brannon’s partial-summary-judgment motion should have been postponed pursuant to Rule 56(f), Ala. R. Civ. P., in order to allow Bank-Trust to engage in discovery regarding the alleged authorization.[8]
*406 We agree with BankTrust that the record contains substantial evidence from which a reasonable fact-finder could conclude that Brannon did not timely object to the payments from the estate account that she claims were improperly requested by McCoy. As noted, the payments transferred by BankTrust from the estate account were repeated every month over the course of a seven-month period. At no time during this period did Brannon ever question those payments. The document entitled “Deposit Account Terms and Conditions,” which was attached to the signature card signed by Brannon, contained the following provision:
“STATEMENTS — YOU MUST EXAMINE YOUR STATEMENT OF ACCOUNT WITH ‘REASONABLE PROMPTNESS’. IF YOU DISCOVER (OR REASONABLY SHOULD HAVE DISCOVERED) ANY UNAUTHORIZED PAYMENTS OR ALTERATIONS, YOU MUST PROMPTLY NOTIFY US OF THE RELEVANT FACTS. IF YOU FAIL TO DO EITHER OF THESE DUTIES, YOU WILL HAVE TO EITHER SHARE THE LOSS WITH US, OR BEAR THE LOSS ENTIRELY YOURSELF (DEPENDING ON WHETHER WE EXERCISED ORDINARY CARE AND, IF NOT, WHETHER WE SUBSTANTIALLY CONTRIBUTED TO THE LOSS). THE LOSS COULD BE NOT ONLY WITH RESPECT TO ITEMS ON THE STATEMENT, BUT OTHER ITEMS FORGED OR ALTERED BY THE SAME WRONGDOER. YOU AGREE THAT THE TIME YOU HAVE TO EXAMINE YOUR STATEMENT AND REPORT TO US WILL DEPEND ON THE CIRCUMSTANCES, BUT THAT SUCH TIME WILL NOT, IN ANY CIRCUMSTANCE, EXCEED A TOTAL OF 30 DAYS FROM WHEN THE STATEMENT IS FIRST MADE AVAILABLE TO YOU.
“YOU FURTHER AGREE THAT IF YOU FAIL TO REPORT ANY UNAUTHORIZED SIGNATURES, ALTERATIONS, FORGERIES OR ANY OTHER ERRORS IN YOUR ACCOUNT WITHIN 60 DAYS OF WHEN WE MAKE THE STATEMENT AVAILABLE, YOU CANNOT ASSERT A CLAIM AGAINST US ON ANY ITEMS IN THAT STATEMENT, AND THE LOSS WILL BE ENTIRELY YOURS. THIS 60-DAY LIMITATION IS WITHOUT REGARD TO WHETHER WE EXERCISED ORDINARY CARE. THE LIMITATION IN THIS PARAGRAPH IS IN ADDITION TO THAT CONTAINED IN THE FIRST PARAGRAPH OF THIS SECTION.”
(Capitalization in original.)
In addition, as noted, the record indicates that Brannon instructed a BankTrust employee, Lyn Peterson, to send checks for the estate account to McCoy and that she listed the mailing address for the estate account as “Estate of Lemuel Morrison, c/o Douglas L. McCoy” followed by Hand Arendall’s mailing address. It is undisputed, as noted, that McCoy initially received all bank statements for the estate account, presumably pursuant to Bran-non’s instruction to Peterson, and that he in turn had a responsibility to forward these statements to Brannon. In addition, as noted, Peterson testified by deposition that Brannon told her that “Doug [McCoy] would handle this account for her.” The record also contains an affidavit from Peterson, in which she avers: “I was told by Ms. Brannon that Doug McCoy would be in charge of this account.”
Furthermore, BankTrust argues on appeal that it attempted, by means of a nonparty subpoena, to obtain docu *407 ments from McCoy and Hand Arendall that would document Brannon’s authorization and/or ratification of McCoy’s payment requests to BankTrust. At Bran-non’s urging, however, that subpoena was quashed by the trial court based on the court’s conclusion that compliance with the subpoena would violate Brannon’s attorney-client privilege. BankTrust argues that that ruling was in error and that it was thereafter prevented from obtaining further evidence from McCoy or Hand Ar-endall relating to such authorization or ratification by virtue of the trial court’s holding regarding Brannon’s attorney-client privilege. BankTrust argues that the entry of the summary judgment against it without its first being allowed to conduct additional discovery in this regard was in error.
We agree with BankTrust that, to the extent BankTrust sought to discover information and documents relating to the issue whether Brannon authorized or ratified McCoy’s payment requests to BankTrust, such information and documents did not constitute privileged attorney-client communications. The attorney-client privilege shields communications between a lawyer and a client that “are based on, or may disclose, confidential information provided by the client or contain the advice or opinions of the attorney.” 81 Am. Jur 2d Witnesses § 357 (2004). When an attorney is the client’s agent in regard to a transaction with a third party, the fact of the attorney’s employment, the authority of the attorney, instructions given to the attorney, and the attorney’s communications to the client in the course of executing his or her duties constitute part of the res gestae of the transaction and would not be privileged information in a lawsuit regarding the transaction. Nyhoff v. Palmer, 217 Ala. 432, 116 So. 520, 524 (1928).[9] See also Rule 502(b), Ala. R. Evid. (explaining that the attorney-client privilege protects against disclosure of “confidential communication[s] made for the purpose of facilitating the rendition of professional legal services to the client”).
On the basis of the foregoing, we conclude that the trial court’s entry of a partial summary judgment on Brannon’s breach-of-contract claim was in error. We reverse that judgment and remand this cause to the trial court for further proceedings as to this issue.

B. Brannon’s Appeal of the Judgment as a Matter of Law as to Her Tort Claims (case no. 1060637)

Brannon argues that the trial court improperly granted BankTrust’s motion for a judgment as a matter of law because, she argues, BankTrust failed to properly plead Article 4A as an affirmative defense in its original answer to Brannon’s complaint. Brannon notes that BankTrust never raised the applicability of Article 4A until the trial court inquired about its applicability four days before the trial date. It also observes that the trial court struck BankTrust’s amended answer asserting Article 4A as an affirmative defense because it was not filed until just before the trial date. Citing the requirement in Rule 8(c), Ala. R. Civ. P., that a party set forth its affirmative defenses in its pleading, Brannon contends that the trial court should never have considered whether Article 4A displaced the tort claims at issue.
Rule 8(c) does not list the statutory displacement of common-law claims as an “affirmative defense.” This is because such *408 displacement is in fact not an affirmative defense.
“An ‘affirmative defense’ is defined as a ‘matter asserted by [the] defendant which, assuming the complaint to be true, constitutes a defense to it.’ ” City of Birmingham v. Business Realty Inv. Co., 722 So.2d 747, 750 (Ala.1998) (quoting Black’s Law Dictionary (6th ed.1990)). For a position to constitute an affirmative defense assumes that the claim against which it is asserted is, in the absence of the assertion of that defense, a cognizable claim under Alabama law.
In International Longshoremen’s Ass’n v. Davis, 470 So.2d 1215, 1216 (Ala.1985), this Court held that “under the circumstances of th[at] case,” the issue of federal preemption that was presented was an affirmative defense.[10] Also, cf. Charles Alan Wright et al., 19A Federal Practice & Procedure: Jurisdiction, Reporter’s Notes D.: Removal on the Basis of Complete Preemption, 699, 701 (2009) (discussing the hurdle to removal posed by the “master-of-the-complaint doctrine” where, on its face, a complaint purports to assert only a claim under state law and noting that, “[i]n the ordinary case in which a defendant asserts that a state-law claim conflicts with and therefore is preempted by federal law, this is treated merely as the assertion of an affirmative defense to the liability otherwise created by state law”).
When federal law completely displaces state law, however, there is authority suggesting a different result. Cf. id. (citing, inter alia, Beneficial Nat’l Bank v. Anderson, 539 U.S. 1, 128 S.Ct. 2058, 156 L.Ed.2d 1 (2003), and noting that the United States Supreme Court has recognized that a federal statute may displace or “completely preempt” state law and not merely immunize a defendant from state-created liability); Billy Jack for Her, Inc. v. New York Coat, Suit, Dress, Rainwear & Allied Workers’ Union, 511 F.Supp. 1180 (S.D.N.Y.1981) (concluding that a finding of preemption represents a conclusion that Congress has determined to supplant state law altogether and that, therefore, federal preemption is not, by its nature, to be viewed merely as an affirmative defense for purposes of deciding the removability of an action brought in *409 state court). See also Charles Alan Wright et al., 14B Federal Practice and Procedure: Jurisdiction § 3722.1 (3d ed.2006) (explaining the difference between “ordinary preemption” and “complete preemption” as being a situation in which Congress “did not just provide a federal defense to the application of state law; rather, it replaced the state law with federal law” (emphasis added), citing Avco Corp. v. Aero Lodge No. 735, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968) (holding that federal law had “absorbed” the otherwise applicable state law)).
When the state law itself changes, however, there can be no argument that the law as changed is somehow an “affirmative defense” to the law as it existed before the change. The law as changed is simply the new law. Thus, if a common-law claim is displaced by a set of statutory rights provided by the legislature, then, by definition, the common-law claim no longer exists in state law, having given way to the new statutory causes of action. By definition, pleading a nonexistent claim constitutes a failure to state a claim upon which relief can be granted. Our holding in this regard finds support in the decisions of this Court and other courts. See, e.g., Continental Cas. Co. v. Compass Bank (Civ. A.04-0766-KD-C, March 6, 2006) (S.D.Ala.2006) (not reported in F.Supp.2d) (concluding that allegations of a common-law conversion by the issuer of a check against a depository bank failed to state a claim because of displacement by the UCC); AmSouth Bank v. Tice, 923 So.2d 1060 (Ala.2005) (holding that the a motion for a judgment as a matter of law should have been granted on the ground that the plaintiffs common-law claims for negligence and wantonness were displaced by the UCC); American Liberty Ins. Co. v. AmSouth Bank, 825 So.2d 786 (Ala.2002) (holding that AmSouth Bank was entitled to a judgment as a matter of law because provisions of the UCC had displaced the plaintiffs common-law cause of action for conversion); Berthot v. Security Pacific Bank of Arizona, 170 Ariz. 318, 321, 823 P.2d 1326, 1329 (Ariz.Ct.App.1991) (affirming the dismissal of the plaintiffs common-law claim of conversion on the ground that, because Arizona’s Uniform Commercial Code “displaces” that common-law claim, the complaint failed to state a claim upon which relief could be granted: “[W]hen a provision of the Arizona U.C.C. displaces the common law on that issue, the common law no longer applies.”).
Brannon further argues, however, that the trial court erred in holding that Fitts v. AmSouth Bank, 917 So.2d 818 (Ala.2005), dictates that Article 4A displaced Brannon’s common-law tort claims. In Fitts, husband-and-wife business partners Fred Fitts and Bellann Fitts filed a complaint that included common-law claims of breach of contract, negligence, suppression, wantonness, and conspiracy against their business partner James George. George argued, and the trial court agreed, that the Fittses’ claims were barred by the one-year statute of repose in § 7-4A-505, Ala.Code 1975. This Court affirmed the trial court’s judgment, specifically holding that Article 4A displaced the Fittses’ common-law claims.
The Fitts Court noted that ordinarily this Court looks to § 7-1-103, Ala.Code 1975, for guidance on the relationship between the UCC and the common law. Section 7-1-103 provides that unless they are displaced by “the particular provisions of’ the UCC, traditional principles of law and equity will supplement the provisions of the UCC. Fitts, 917 So.2d at 824 n. 7. In concluding that Article 4A displaced the *410 common-law claims at issue in that case, however, the Fitts Court noted and quoted extensively from the Official Comment to § 7-4A-102, which provides, in part:
“In the drafting of Article 4A, a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment. A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles....
“Funds transfers involve competing interests — those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this article.”
(Emphasis added.) See generally AmSouth Bank v. Tice, 923 So.2d at 1065 (discussing and applying criteria for determining whether a statutory provision has displaced a common-law cause of action); American Liberty Ins. Co. v. AmSouth Bank, 825 So.2d at 794-95 (same).
Brannon contends that the rights and responsibilities provided by Article 4A do not displace her common-law claims of negligence and wantonness in this case because, she says, Article 4A does not purport to provide an exclusive remedy with respect to facts like those presented here. Brannon characterizes those facts as involving a “debit transfer,” and not a “credit transfer within the contemplation of Article 4A.” [11]
We note that § 7-4A-102 provides that, with exceptions not applicable here, Article 4A applies to funds transfers defined in § 7-4A-104. Section 7-4A-104 defines “funds transfers” in pertinent part as follows:
“[T]he series of transactions, beginning with originator’s payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator’s bank or an intermediary bank intended to carry out the originator’s payment order.”
(Emphasis added.)
According to § 7-4A-103(a)(l)(ii), Ala. Code 1975, for an instruction to qualify as a “payment order” under Article 4A, it must be one with respect to which “the receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender.” (Empha *411 sis added.) Section 7-4A-103(a)(5) states that a “ ‘sender’ means the person giving the instruction to the receiving bank.” For purposes of Article 4A and the protection it provides to receiving banks in relation to credit transfers, § 7-4A-202(d) expands the term “sender” to include “the customer in whose name a payment order is issued if the order is the authorized order of the customer under subsection (a) [of § 7-4A-202], or it is effective as the order of the customer under subsection (b) [of § 7-4A-202].”[12]
Paragraph 4 of the Official Comment to § 7-4A-104, Alabama Code 1975, explains further the provision that a “payment order” entails reimbursement to the receiving bank from “the sender” or the sender’s account:
“Transfers of funds made through the banking system are commonly referred to as either ‘credit’ transfers or ‘debit’ transfers. In a credit transfer the instruction to pay is given by the person making payment. In a debit transfer the instruction to pay is given by the person receiving payment. The purpose of subparagraph (ii) of subsection (a)(1) of Section 4A-103 is to include credit transfers in Article 4A and to exclude debit transfers.... Article 4A is limited to transactions in. which the account to be debited by the receiving bank is that of the person in whose name the instruction is given.”[13]
In the present case, it was contemplated that BankTrust, the receiving bank, would be, and it was, reimbursed by the estate account. Thus, in order for the instruction given in this case to qualify as a “payment order,” it must have been given by or on behalf of the Morrison estate as the sender.
As noted, § 7 — 4A-202(d) provides that a “sender” includes a customer in whose name a payment order is issued “if the order is the authorized order of the customer under subsection (a), or it is effective as the order of the customer under subsection (b). Section 1 of the Official Comment following § 7-4A-203 explains that “[a] person in whose name a payment order is issued is considered to be the sender of the order if the order is ‘authorized’ as stated in subsection (a) [of § 7-4A-202] or if the order is ‘verified’ pursuant to a security procedure in compliance with subsection (b) [of § 7-4A-202].” *412 Subsection (b) is not applicable in this case; subsection (a) of § 7-4A-202 provides that “[a] payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the laws of agency.” (Emphasis added.)
Brannon argues on appeal that the funds transfers at issue in this case were not credit transfers for purposes of the protection afforded banks by Article 4A. Therefore, according to Brannon, her common-law claims of negligence and wantonness are not displaced. She notes that McCoy instructed BankTrust to make the payments to his law firm, a creditor of the Morrison estate, as supportive of her position.
We agree that Article 4A applies only to “credit transfers” as defined in that article and that it displaces common-law causes of action only in relation to credit transfers as so defined. Because the trial court appears to have ignored or rejected this proposition in entering its judgment as a matter of law in favor of BankTrust, and because it cannot be said as a matter of law on the record before us that the transfers at issue constitute credit transfers as defined in Article 4A, that judgment is due to be reversed. In so holding, however, we stop short of concluding that the funds transfers at issue did not, in fact, constitute such credit transfers. Indeed, as we have already noted, there is some evidence already in the record that would tend to support a finding that the transfers fell within the authority granted by Bran-non to McCoy and that, for that reason, the Morrison estate should be deemed the “sender” in whose name the payment order was issued. Also, consistent with our discussion above, further discovery appears to be in order as to the extent to which McCoy was authorized by Brannon to make the transfers. See § 7-4A-202(a). By the same token, a genuine issue of fact remains as to whether Brannon, even if she did not authorize McCoy to initiate the transfer, “is otherwise bound by [the transfers] under the law of agency” for purposes of § 7-4A-202. Accordingly, we reverse the trial court’s judgment as a matter of law as to Brannon’s negligence and wantonness claims and remand the cause for further proceedings.

IV. Conclusion

Based on the foregoing, we reverse the trial court’s partial summary judgment in favor of Brannon and its judgment as a matter of law in favor of BankTrust.
1060637 — APPLICATION OVERRULED; OPINION OF JULY 31, 2009, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
1061059 — APPLICATION OVERRULED; OPINION OF JULY 31, 2009, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
COBB, C.J., and LYONS, WOODALL, STUART, SMITH, BOLIN, PARKER, and SHAW, JJ., concur.

. Peterson testified that she had known McCoy for 19 years and that he had been her next-door neighbor for 5 or 6 years.

. Johnson admitted that he had known McCoy on a personal basis for 25 years because McCoy’s wife is one of Johnson’s cousins.

. Johnson admitted that he knew that McCoy also served as the attorney for the Morrison estate.

. A claim of conspiracy also was alleged, but that claim subsequently was voluntarily dismissed by Brannon.

. Section 7-4-406, Ala.Code 1975, addresses the necessity of a bank customer’s timely reviewing account statements and notifying the bank of problems with the account.

. Subsequently, in a motion to compel a response to its “First Request for Production of Documents,” BankTrust argued that the information it sought "would reveal the extent of [Brannon's] knowledge concerning the transfers from the [estate] account; whether [Brannon] authorized each transfer; and when [Brannon] first either knew or should have known the transfers were taking place, all of which is relevant to the issue whether the transfers were authorized or unauthorized in the first instance and whether [Brannon] has discharged her duty of reviewing her bank statements with 'reasonable promptness.’ "

. Brannon took the position in the trial court that Article 4 governed only "negotiable instruments” and that the funds transfers did not constitute negotiable instruments. She pointed to Article 4A as support for this assertion, noting its applicability to funds transfers; however, she argued, for reasons explained in the text below, that Article 4A did not displace *402 her common-law claims in this particular case.

. The parties disagree in their briefs on appeal as to the applicability of Article 4A of the UCC to Brannon’s breach-of-contract claim. We have carefully reviewed the record, including the summary-judgment motion filed by Brannon, the written response to that motion filed by BankTrust, and the trial court’s summary-judgment order itself. It is clear from our review of these matters that the trial court's granting of Brannon’s motion for a partial summary judgment was based on its consideration of common-law principles relating to breach-of-contract claims and defenses to such claims and not on any right of recovery that might exist in Brannon’s favor under Article 4A. We therefore have not addressed BankTrust’s arguments on appeal pertaining to Article 4A as a basis for reversing the summary judgment. This Court will not reverse a judgment on a ground not argued to the trial court. Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992). Nothing in this opinion, however, prevents the parties, on remand, from presenting to the trial court the issue whether Article 4A displaces Bran-non’s common-law breach-of-contract claim.

. Because we decide that, on the basis of the principles recognized in Nyhoff v. Palmer, BankTrust is entitled to at least some of the discovery it sought before the entry of the partial summary judgment against it, we pre-termit consideration of BankTrust's other arguments made in an effort to achieve this result.

. It should be noted that the issue with which the Davis Court was concerned was whether "the National Labor Relations Act preempts a state’s subject matter jurisdiction,” or "whether federal preemption is[, instead,] a waivable defense.” 470 So.2d at 1216. The issue whether preemption constitutes an affirmative defense as opposed to an abrogation of state law was not necessary to the Court’s decision. Either the noncogniza-bility of a state claim as a result of federal preemption or the treatment of federal preemption as merely an affirmative defense to an otherwise valid state-law claim would have led to the same result, i.e., a defense to the plaintiff’s claim that was not jurisdictional and that could be waived if, as in Davis, it was not properly raised before the trial court.
Also, the Davis Court itself explained that it was not deciding that the state-law claim before it had in fact been preempted by federal law but was addressing only the question whether the assertion that the state-law claim is "subject to preemption” must be properly preserved in the trial court in order for it to be reviewed on appeal. 470 So.2d at 1216 n. 2. In fact, the Court explained that, “if [it] were to rule on the merits, [it] could not find that the state court’s jurisdiction is federally preempted.” Id. The Court noted that the state-law claim presented to it was "an ordinary misrepresentation suit” against a supervisor, that ”[t]he National Labor Relations Board [ (‘NLRB’) ] ha[d] already determined that an employer’s supervisors are not protected by the Labor Management Relations Act,” and ”[t]hus, in this case, Plaintiff has no remedy before the NLRB, and this dispute, although somewhat labor-related, is, at most, only of 'peripheral concern' to the NLRB.” Id. Davis, therefore, is not a case in which the asserted state-law claim arguably had been displaced by federal law.

. In Fitts, no question was raised as to whether the funds transfer at issue was a “credit transfer” or a "debit transfer”; accordingly, Fitts contains no discussion regarding the distinction between those two types of transfers. We therefore find it unnecessary, for purposes of deciding the present case, to consider what bearing, if any, that distinction would have had on die outcome in Fitts.

. Subsections 7-4A-202(a) and (b) state:
“(a) A payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency.
"(b) If a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if (i) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (ii) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer. The bank is not required to follow an instruction that violates a written agreement with the customer or notice of which is not received at a time and in a manner affording the bank a reasonable opportunity to act on it before the payment order is accepted.”

. Paragraph 4 of the Official Comment to § 7-4A-104 provides the following example of a credit transfer, where X is the owner of an account: "With respect to X’s instruction given to Bank A, Bank A will be reimbursed by debiting X’s account or otherwise receiving payment from X.”